## STATE OF GEORGIA *v.* STANTON.

1. A bill in equity filed by one of the United States to enjoin the Secretary of War and other officers who represent the Executive authority of the United States from carrying into execution certain acts of Congress, on the ground that such execution would annul and totally abolish the existing State government of the State and establish another and different one in its place—in other words, would overthrow and destroy the corporate existence of the State by depriving it of all the means and instrumentalities whereby its existence might, and otherwise would be maintained—calls for a judgment upon a political question, and will therefore not be entertained by this court.

2. This character of the bill is not changed by the fact that in setting forth the political rights sought to be protected, the bill avers that the State has real and personal property (as for example, the public buildings, &c.), of the enjoyment of which, by the destruction of its corporate existence, the State will be deprived; such averment not being the substantive ground of the relief sought.

THIS was a bill filed April 15, 1867, in this court, invoking the exercise of its original jurisdiction, against Stanton, Secretary of War; Grant, General of the Army, and Pope, Major-General, assigned to the command of the Third Military District, consisting of the States of Georgia, Florida, and Alabama (a district organized under the Acts of Congress of the 2d March, 1867, entitled " An act to provide for the more efficient government of the rebel States," and an act of the 23d of the same month supplementary thereto), for the purpose of restraining the defendants from carrying into execution the several provisions of these acts; acts known in common parlance as the " Reconstruction Acts." Both these acts had been passed over the President's veto.

[The former of the acts, reciting that no legal State governments or adequate protection for life or property now existed in the rebel States of Virginia and North Carolina, South Carolina, *Georgia*, Mississippi, Alabama, Louisiana, Florida, Texas, and Arkansas, and that it was necessary that peace and good order should be enforced in them until loyal and republican State governments could be legally established, divided the States named into five military districts, and

made it the duty of the President to assign to each one an officer of the army, and to detail a sufficient military force to enable him to perform his duties and enforce his authority within his district. It made it the duty of this officer to pro tect all persons in their rights, to suppress insurrection, disorder, violence, and to punish, or cause to be punished, all disturbers of the public peace and criminals, *either through the local civil tribunals or through military commissions,* which the act authorized. It provided, further, that when the people of any one of these States had formed a constitution in conformity with that of the United States, framed by a convention of delegates elected by male citizens, &c., of twenty-one years old and upwards, "of whatever race, color, or previous condition," who had been residents in it for one year, "except such as may be disfranchised for participation in the rebellion," &c., and when such constitution should provide, &c., and should be ratified by a majority of the persons voting on the question of ratification, who were qualified for electors as delegates, and when such constitution should have been submitted to Congress for examination and approval, and Congress should have approved the same, and when the State by a vote of its legislature elected under such constitution should have adopted a certain article of amendment named, to the Constitution of the United States, and ordaining among other things that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the State where they reside," and when such article should have become a part of the Constitution of the United States, then that the States respectively should be declared entitled to representation in Congress, and the preceding part of the act become inoperative; and that until they were so admitted any civil governments which might exist in them should be deemed provisional only, and subject to the paramount authority of the United States, at any time to abolish, modify, control, or supersede them.

The second of the two acts related chiefly to the registration of voters who were to form the new constitutions of the

States in question, and which registration by the act, could include only those persons who took and subscribed a certain oath set forth in such second act, as that they had " not been disfranchised for participation in any rebellion or civil war against the United States," &c.]

The bill set forth the existence of the State of Georgia, the complainant, as one of the States of this Union under the Constitution; the civil war of 1861–1865 in which she was involved; the surrender of the Confederate armies in the latter year, and submission to the Constitution and laws of the Union; the withdrawal of the military government from Georgia by the President, commander-in-chief of the army; and, the revival and reorganization of the civil government of the State with his permission; and that the government thus reorganized was in the possession and enjoyment of all the rights and privileges in her several departments—executive, legislative, and judicial—belonging to a State in the Union under the Constitution, with the exception of a representation in the Senate and House of Representatives of the United States.

It set forth further that the intent and design of the acts of Congress, as was apparent on their face and by their terms, was to overthrow and to annul this existing State government, and to erect another and different government in its place, unauthorized by the Constitution and in defiance of its guarantees; and that, in furtherance of this intent and design, the defendants (the Secretary of War, the General of the Army, and Major-General Pope), acting under orders of the President, were about setting in motion a portion of the army to take military possession of the State, and threatened to subvert her government, and to subject her people to military rule; that the State was wholly inadequate to resist the power and force of the Executive Department of the United States. She therefore insisted that such protection could, and ought, to be afforded by a decree, or order, of this court in the premises.

The bill then prayed that the defendants might be restrained:

1. From issuing any order, or doing, or permitting any act or thing within or concerning the State of Georgia, which was or might be directed or required of them, or any of them, by or under the two acts of Congress.

2. From causing to be made any registration within the State, as specified and prescribed in the last of the aforesaid acts.

3. From administering, or causing to be administered within the State, the oath or affirmation prescribed in said act.

4. From holding, or causing to be held within the State, any such election, or elections, or causing to be made any return of any such elections for the purpose of ascertaining the result of the same according to said act.

5. From holding, or causing to be held within the State, any such convention as is prescribed therein.

The bill in setting forth the political rights of the State of Georgia, and of its people sought to be protected, averred among other things, that the State was owner of certain real estate and buildings therein (the State capitol, at Milledgeville, and Executive mansion), and of other real and personal property, exceeding in value $5,000,000; and that putting the acts of Congress into execution and destroying the State would deprive it of the possession and enjoyment of its property. This reference and statement were not set up, however, as a specific or independent ground of relief, but apparently only by way of showing one of the grievances resulting from the threatened destruction of the State, and in aggravation of it. And the matter of property was not noticed in the prayers for relief.

*Mr. Stanbery, A. G.,* at the last term moved to dismiss the bill for want of jurisdiction.

*In support of this motion.* Our first objection is that we have not such parties here as authorize this court to entertain any case. Who is this controversy with? It is with officers of the United States of a very high grade. Is it with them as individuals? Not at all; but with them as officers of the United States, who have no State citizenship,

but are bound to reside here. The place of official residence of the Secretary of War and commanding general is by law in the District. Now, when you are asked to entertain the limited jurisdiction given to this court in an original case, and find that as to parties it must, by the terms of the Constitution,* be a controversy between " a State and *citizens* of another State," is there anything that fulfils the idea of such a controversy? Suppose to-morrow Mr. Stanton is removed, or resigns his post as Secretary of War, what becomes of Stanton, a citizen of Ohio, defendant in this case? Is there any controversy left between Georgia and Stanton as an individual and a citizen of Ohio? None.

Next, as to the nature of the right set up here, the alleged infractions of that right, and the relief which is asked from this court to establish that right.

The bill is premature; it involves at the same time a political question only. It involves, therefore, a political question which may never arise. The uncertainty whether *any* question will ever arise, and the fact that if any does arise it will be political, are both fatal to the bill.

Look at the state of things when this bill was filed. A controversy that raged a few weeks ago in Congress is brought here to be settled. The President attempted to settle it. Constitutionally he attempted to give the relief which is sought here. In the exercise of his constitutional powers, the President, while these acts were upon their passage, attempted to stop them by his veto, but Congress, also acting under the Constitution, passed them over his veto, by the requisite majority. The laws were passed. Now if there is jurisdiction in this court to stop the execution of these laws, there was jurisdiction on the 24th of March, when the last act was passed, before the President had even appointed military commanders; because the danger threatened here is altogether prospective. But what would this be? Nothing but judicial veto; a veto, in fact, far superior to the Presidential veto. A judicial veto, a judicial sentence of a court

---

* Article III, § 2.

of the last resort is final, and one which no Congress, and no two-thirds in Congress, could change or modify. It would stand as fixed as the law pronounced by a tribunal that remains here for life; it could not be set aside by any changes in the popular sentiment. It would be settled forever. This would be an absolute veto; the same veto that the Roman Tribunes had. What was that? Those officers, chosen during the Republic to protect the interests of the people, called Tribunes, had no insignia of office. No rods or lictors preceded them; no emblems of sovereignty accompanied them. They had not a house; they sat on benches. They dared not enter the Senate-house. They could only be elected from the plebeians. And yet the majesty of the Roman people was represented by them, and they had authority, by pronouncing one word, *veto*, to stop every ordinance of the Senate, to stop the execution of every law, absolutely and conclusively, without any appeal. That power was called by Cæsar *ultima jus Tribunorum*. What is this but that?

If this can be done, the same jurisdiction may be invoked wherever a court can get nominal parties; may be invoked in regard to every law that Congress may pass before it proceeds to execution, and before as yet a case has arisen under it. In the present case, the complainant carries his prayer for an injunction down to the meeting of the convention. But he might as well carry it further, and ask to enjoin the convention from framing a constitution; a little further, and enjoin the people from ratifying the constitution; a little further yet, and enjoin the president of the convention from sending that new constitution here to the President of the United States; a step further, and enjoin the same President from sending that constitution to Congress; a step further, and enjoin Congress from accepting it. For, after all, that is the point; that works all the mischief, and nothing but that does work it, for until Congress acts all that is done is unimportant. Why not, then, have gone a step further, and, to get relief, have now enjoined Congress from ratifying the constitution?

If there is a power in this court to veto laws which the Congress considers wholesome and necessary, such a power has never before been invoked. A suggestion that there should be some such a power was made in the convention that framed the Constitution. The scheme then presented was not half so bad as this, but something like it was proposed by Mr. Randolph, the elder. In the convention he offered this resolution :

*Resolved,* That the executive and a convenient number of the national judiciary ought to compose a council of revision, with authority to examine every act of the national legislature before it shall operate, and every act of a particular legislature before a negative thereon shall be final ; and that the dissent of the said council shall amount to a rejection, unless the act of the national legislature be again passed, or that of a particular legislature be again negatived by —— of the members of each branch.

Here was an attempt to give a qualified veto power, to be vested, not in the judiciary alone, but in the judiciary with the executive, sitting as a council of revision upon every law after its passage, before it had gone into operation, before its mischiefs were developed. It found no favor with the convention; it was rejected; and instead of that, the actual veto power as it now exists, proposed by General Pinckney, was adopted, separating the judiciary from the consideration of such questions, leaving them to consider a law only when it should regularly come before them in its execution upon a proper case and with proper parties.

The case is political and uncertain in every way that you look at it. It is a bill by a State to vindicate its political rights. The State of Georgia here comes into court alleging that it is a State, putting that matter in issue. We do not make any question now as to a court of equity being a fit court to decide whether a State is in the proper enjoyment of its political franchises. Opposite counsel allege that Georgia is now a State of the Union, and ask the court to find that it is so. If they allege it as a matter of fact, we

have a right to deny it; and what is the consequence? If this court has jurisdiction to decide that Georgia is a State, it has just the same jurisdiction to decide that Georgia is not a State, and that great political question, State or not a State, is settled and settled forever by this court.

*The Cherokee Nation* v. *The State of Georgia*\* goes far to decide this case. The attempt there was by the Cherokees, as a separate nation, to prevent the execution of certain laws of Georgia violating their rights secured by treaty. But the court declined to interfere in this way. It acted upon what was declared long before by Ellsworth, C. J., in *New York* v. *Connecticut*.† "In no case can a specific performance be decreed unless there is a substantial right of soil, not a *mere political jurisdiction to be enforced.*"

But what next? It is alleged that Georgia has certain political rights and privileges, and also that she has certain property. We can see very well where the learned counsel were tending when they came to that part of the case, and that they had at least some inkling of the difficulties of bringing a State into a court of equity to vindicate its political rights and the franchises and rights of its citizens. They saw that there was no precedent for such a proceeding as that. They saw the necessity of founding the equity jurisdiction of the court upon the State of Georgia as a corporation, and as a corporation whose franchises and rights were about to be disturbed, and therefore entitled to preventive relief, as an individual would be to protect his property and his rights from irreparable mischief and injury. But although it is mentioned that the State owns lands, it is not alleged that anybody is going to take those lands. It does not appear that anybody has erected a nuisance on those lands or is about to erect one. It does not appear that anybody is about to bring suit in regard to those lands, and that it is necessary to stop litigation and prevent the State being vexed by suits. It is simply alleged that the State has such lands. These military officers do not pro-

---

\* 5 Peters, 1.                  † 4 Dallas, 5; 2d ed., *note.*

pose to take the lands, nor can they take them. What, then, is the danger to these lands ? It is, that if finally these acts are consummated,—if finally there is a new constitution provided for Georgia, and ratified by the people of Georgia, which new constitution becomes the constitution of that State, the present organism of Georgia ceases; the present State government is displaced and loses its hold of these lands. Then where do they go? Who does the present government hold them for ? For the people of Georgia for public uses. If a new constitution shall come into opera- tion and be ratified by the people of Georgia, the new gov- ernment will hold these lands for the same purposes, not for waste, not for destruction, not for changing their destination, not as in the case of a charity to devote them to other uses, not as in the case of the property of a private corporation to turn them to other uses and to the purposes of a foreign cor- poration, but at last, change the form of government as you please, the people of the State of Georgia will own all their lands, undisturbed in any way, if these laws are carried out.

Before we even touch these lands, before we touch a single one of these rights of Georgia, this court is asked to interpose. And what is it asked to do? I take a distinc- tion between matters that lie in the choice or discretion of the commanding general as to the extent to which he will execute military law there and other matters. He has simply said: "I will execute the law." Now, under the acts, he can execute it in either of two ways. He can exe- cute it by making it a military despotism at once, by unship- ping all the civil tribunals, courts, and officers, or he can execute the law just as well by leaving them all untouched. It is not alleged that Pope threatens that he is going to dis- place the governor, the legislature, the courts, the execu- tive officers, the whole machinery of civil government in Georgia. He has simply said that he will execute the law. Whether he will execute it by the rigor of martial rule, dis- placing the civil authorities, or execute it by leaving them all in perfect play, he has never said. The first practical thing to be done under these laws is the appointment of

Argument against the jurisdiction.

boards of registry to make a registration of voters, preparatory to the election. That is the initiatory step. It has not yet been taken, but it is to be taken; and the especial prayer of this injunction is to stop that very thing, with a series of others that are to follow afterward.

Here, then, is an attempt to induce a court of equity to stop an election,—a political election; to prevent the registration of voters by a decree of a court of equity before any registration is made. The evil lies away beyond that; the evil is not in registering the voters, but in something that the voters are afterward to do, and something that the convention is afterward to do, and something that is to be the result of all these labors. But these things have not yet happened, and counsel propose to begin by asking you to stop the registration of voters. They say they can have no adequate relief against that registration, and the evils that lie beyond, except in a court of equity. They cannot wait until the laws are executed, but they must have relief now. There have been many bills in equity in various States, but who has heard that it was the function of a court of equity to stop an election? What are the consequences of an election? To make officers and invest them with powers. If these officers and these powers are going to invade any rights, they are the rights of other officers legally executing some power. Do we go to a court of equity to be relieved against an officer elected? Take the case of an officer illegally elected at an illegal election. Being so elected, he has no right to intrude upon the legal officer; but that is no case for a court of equity. It is a case for a *quo warranto*.

But these defendants cannot compel the registration. These laws compel no man in Georgia, black or white, to be registered; nor do they authorize the military commander to seize and punish any one for not going to the election. It is left entirely to the citizens to decide for themselves whether they shall be registered or not. You cannot very well stop them. What next? An election is held. Who votes at the election? Just who chooses. How do you know that anybody is going to attend that election?

How do you know that an election will be ordered, or that, if ordered, Georgia is going to accept the offer made by Congress? The people that the State of Georgia comes here to protect, can protect themselves against all this mischief by not going to the election, because the mischief is the election of a government that is going to displace the existing government. But suppose the people go to the election and vote for delegates; the delegates are not obliged to go to the convention; there is no law to punish them for not attending. If they go, they frame a constitution. That is left to themselves. Congress simply says that a certain provision in regard to suffrage must be inserted in the constitution, or it will not be recognized by the legislative department. If the convention cannot agree, there is an end of the whole proceeding; but if they agree and make a constitution containing the stipulation provided for by Congress, the people are then to hold an election to ratify it. If the people ratify it, it will be because they like it. It is left to them to do it or not. If they do it, the next step is to send the constitution to the President, and by him it is to be sent to Congress, and then Congress is to act.

These things all lie in the unknown and unascertained future. As yet, not one of us is so wise as to see into that future and know what is to happen, or whether the mischiefs that opposite counsel see in the distance are ever going to take bodily shape. Counsel must show a controversy with a party, not a controversy with the law; they must show an individual right, not a general public right. This court does not sit as conservators over public rights, and as such to guard them in the very beginning against the execution of an obnoxious law. It sits only in a controversy after a controversy has arisen. If there was no other objection to the case, this would be sufficient, namely, that no controversy has ever arisen under this law with any party, citizen of a State, public officer, or anybody else.

But suppose that the mischiefs which the bill says will be consummated are consummated; suppose that what is proposed to be done is done, and all that is future and contin-

gent becomes actual and past, and a constitution is framed under these laws and is accepted and ratified by Congress as the constitution of Georgia, and then an appeal is made to the court not to prevent, but to restore, to keep, to preserve the right of the contesting State organization as the State government of Georgia,—what sort of a question would the court then encounter? The same that it encountered in the Dorr case, *Luther* v. *Borden.** A new constitution formed by the people of a State under the authority of these acts, and an older State constitution formed by the people under due authority, as they alleged,—these two sovereignties at once enter into a contest for supremacy. Is that a sort of controversy which the court can decide as a court of equity? In the first place, the parties will not stop to come to a court; they will settle things by force. The old State government, if it is a legal one, has a right to resist any usurped government that pretends to be the State. If that usurped government brings against it a force that it cannot withstand, what then is its remedy? To come to a court of equity to ask them to enjoin the advance of the hostile force; to say to the commanding general, " You shall stop your march; we hold that you are not the rightful government; this other is?" Certainly not. The Constitution contemplates exactly that state of things. If the existing State government of Georgia, which the opposite counsel represent, is the legal State, it will remain the legal State, notwithstanding these laws. If, as they say, these laws are unconstitutional and void, no authority given under them can ever prejudice the State. Is there no remedy? If the new constitution is supported by an armed force greater than the present government can bring to bear against it, what is the remedy? A court? No; but Congress and the President, —the political power. They are then precisely in the situation pointed out by the Constitution,—a State in insurrection; a lawful State warred upon by an unlawful, unauthorized body claiming to be a State, using force against force

---

* 7 Howard, 1.

that the rightful State cannot overcome. Then comes a case for political interference. Then Congress and the President must decide which of these two is the rightful State; and when they decide it, it is decided for this court and for all; for that is the only tribunal that can decide it.

*Messrs. Charles O' Connor, R. J. Walker (with whom were Messrs. Sharkey, Black, Brent, and E. Cowan), contra:*

It is said that we have not proper and competent parties. That is a very narrow view of the subject. It is true that the framers of the Constitution do not seem to have been so cautious as to take into their consideration this nice exception that, by possibility, there might be some people living within the district, ten miles square or less, that might be ceded to Congress for the seat of Government, who would not be citizens of any State, and therefore not provided for by this provision. Nor that there ever would be any considerable number of persons in the whole world other than citizens of the menaced State, against which the State would have any cause of complaint that it would desire to redress, except their fellow-citizens of other States of the Union, or strangers who were subject to foreign nations. But they did provide that a State should have a judicial remedy against any individuals who were beyond the reach of its power and process, who might do it an injury, and of course who might menace an injury. This right is given in the Constitution itself. This is the court of first instance into which the State is to come. What is it to have here? All the remedies, surely, for the enforcement of its rights that are usual and customary according to the laws of the parent State, and the existing laws of the Colonies as they were, and the laws of these States during the short period they had existed as States, that were allowed in courts in cases at law or in equity.

The rejection in the convention of the proposition for a a council of revision offers no objection to the jurisdiction of the court in this case. This court was not thereby separated from political questions. Not at all. It was separated

indeed from any participation, in any shape, in legislation. At least, legislative power was not conferred upon it. The jurisdiction of the court, as a court created under the Constitution, was, of course, intended to apply to all questions with which the court was capable of dealing. The Attorney-General has spoken of a *quo warranto* as being the proper remedy. There can be no *quo warranto* in this court upon the governor of a State for exercising his powers. His is a State office, and a *quo warranto* by the judiciary of a State against its governor would be very much like that so ably condemned, not long since, by Mr. Attorney himself in *Mississippi* v. *Johnson, President,*\*—a writ issuing out of this court against the Chief Executive.

Much has been said about all the evil alleged in the bill being contingent and future. The argument is, that though the sword is suspended above us, the hair by which it hangs may never break. But we have presented plainly and distinctly, facts that cannot and have not been denied. The President says that he will execute these acts of Congress. General Grant, it is known to all, has issued an order, to the commanders of these various districts, declaring that the acts are to be carried into execution. The minor officers have declared their intention to execute them. Counsel say that the court will not act upon fears and apprehensions. The fact is quite otherwise. A bill *quia timet* is one of the very heads of equity jurisdiction. It must, to be sure, be a stable and substantial fear; but when the Executive of the United States declares that he will execute a certain set of provisions, when his General-in-Chief declares that he will execute them, when that necessarily involves the bringing into play of the whole military force of the Union against a particular State, shall it be said that the fears are not substantial?

The Attorney-General quite understates the effects of these Reconstruction Acts. Their actual effect is to restrain at once the holding of any election within the State for any

---

\* 4 Wallace, 475.

officers of the present State government by any of the State authorities; to direct all future elections in the State to be held under the direction of, and by officers appointed by, the military commander; and that all persons of certain classes described shall be the electors permitted to vote at such election. It is, therefore, an immediate paralysis of all the authority and power of the State government by military force; a plain setting aside of the present State government, and depriving it of the necessary means of continuing its existence. It is substituting in its place a new government, created under a new constitution, and elected by a new and independent class of electors. What is the effect of this upon the State government and upon the State now existing? The same, just, as if in the case of a private corporation (which could only keep up its existence by regular periodical elections by its stockholders), the persons having an interest in it, the owners of its franchise, and the right to perpetuate it, were forbidden to vote, deprived of the right,— or a large number of them were so forbidden and deprived— and a mass of persons having no right whatever were introduced. This is a direct attack upon the constitution of the corporation in the case supposed—a direct attack upon the constitution and fundamental law of the State in the case before the court.

To grant an injunction in such a case is manifestly within the jurisdiction of equity.*

The grievance of which Georgia complains is analogous; a proceeding to divest her of her legally and constitutionally established and guaranteed existence as a body politic and a member of the Union. To explain. By the fundamental law of Georgia, as we know, its constituent body is, and always has been, composed of the "free white male citizens of the State, of the age of twenty-one years, who have paid all taxes which may have been required of them, and which

---

* Ward *v.* The Society of Attorneys, 1 Collyer's New Cases in Chancery, 379; Simpson *v.* Westminster Palace Hotel Company, 8 Clark (House of Lords' Cases), 717; Dodge *v.* Woolsey, 18 Howard, 341.

they have had an opportunity of paying agreeably to law for the year preceding the election, being citizens of the United States, and having resided six months either in the district or county, and two years within the State."*

A State is "a complete body of free persons united together for their common benefit, to enjoy peaceably what is their own, and to do justice to others.   It is an *artificial* person.   It has its affairs and its interests.   It has its rules.   It has its rights.†   A republican State, in every political, legal, constitutional, and juridical sense, as well under the law of nations, as the laws and usages of the mother country, is composed of those persons who, according to its existing constitution or fundamental law, are the constitutent body. All other persons within its territory, or socially belonging to its people, as a human society, are subject to its laws, and may justly claim its protection; but they are not, in contemplation of law, any portion of the body politic known and recognized as the State.   On principle it must be quite clear that the body politic is composed of those who by the fundamental law are the source of all political power, or official or governmental authority.   Dorr's revolutionary government in Rhode Island was an attempted departure from it.‡   In that case the precise thing was done by Dorr and his adherents which these acts in the present instance seek to perform.   There was a State government in the hands of a portion of the people of that State constituting its whole electoral body.   Dorr was of opinion, and his adherents supported him in it, that a greater number of electors ought to be admitted, and he therefore undertook, by spontaneous meetings, to erect an independent State government.   He failed in so doing.   The court decided that it was no government, but that the original chartered government which there existed was the legitimate and lawful government, and consequently Dorr failed.   The same reasons would lead to the overthrow of these acts of Congress.   The

---

* Constitution of Georgia, 1865, Art. 5, § 1.

† Chisholm v Georgia, per Wilson J., 2 Dallas, 45.

‡ Luther v. Borden, 7 Howard, 1.

State has a right to maintain its constitution or political as-sociation.    And it is its duty to do what may be necessary to preserve that association.    And no external power has a right to interfere with or disturb it.*    In *Rhode Island* v. *Massachusetts*,† this court says, that "the members of the American family [meaning the States] possess ample means of defence under the Constitution, which we hope ages to come will verify."    What means of defence under the Constitution is possessed by Georgia, if this suit cannot be maintained ?

The change proposed by the two acts of Congress in question is fundamental and vital.    The acts seize upon a large portion—whites—of the constituent body and exclude them from acting as members of the State.    It violently thrusts into the constituent body, as members thereof, a multitude of individuals—negroes—not entitled by the fundamental law of Georgia to exercise political powers.    The State is to be Africanized.    This will work a virtual extinction of the existing body politic, and the creation of a new, distinct, and independent body politic, to take its place and enjoy its rights and property.    Such new State would be formed, not by the free will or consent of Georgia or her people, nor by the assent or acquiescence of her existing government or magistracy, but by external force.    Instead of keeping the guaranty against a forcible overthrow of its government by foreign invaders or domestic insurgents, this is destroying that very government by force.    Should this be done, and the magistracy of the new State be placed in possession, the very recognition of them by the Congress and President, who thus set them up, would be a conclusive determination, as between such new government and the State government now existing.    This court would be, then, bound to recognize the latter as lawful.‡

Independently of this principle, the forced acquiescence of the people, under the pressure of military power, would soon work a virtual extinction of the existing political society.

---

* Vattel's Law of Nations, book 1, ch. 2, § 16; Ib., book 2, ch. 4, § 57.

† 12 Peters, 745.                    ‡ Luther *v.* Borden, 7 Howard, 1.

Each aspect of the case shows that the impending evil will produce consequences fatal to the continuance of the present State, and, consequently, that the injury would be irreparable.

The great objection, of the other side,—viz., that the subject-matter of the bill, the case stated, and the relief sought, are *political in their nature*,—is without force.

Had it been asserted that this court was without political *power*, or without any physical power; that it could not supervise or control action on questions of policy touching the administration of any power of government, internal or external, committed by the Constitution to either or both of the departments commonly denominated the political departments, the assertion would be correct. But when, under cover of an undefined phrase, it is asserted that this court cannot pronounce upon the validity of an act which may be confessedly at war with the Constitution, repugnant to its whole spirit and intent, and which cannot be brought within the range of any power conferred by the Constitution, or any duty committed by it to any of the departments, the phrase is not correct. Political power cannot, indeed, exist anywhere except under and by force of the Constitution; and whenever it does exist, it must be exercised exclusively by those officers or persons to whom the Constitution has committed it. But whether under the Constitution it exists at all, in a given case, is a question as clearly within the range of judicial cognizance as any other that can arise.

It is untrue that questions of a political nature, according to the vulgar acceptation of that phrase, are unsuited to judicial cognizance. Of course no court can, judicially, investigate or determine *any* question unless parties, between whom it has cognizance, are regularly before it; unless the disputable facts, if any, be susceptible of a judicial trial, and unless the relief sought be judicial in its form and nature: but when these three circumstances concur, the nature of the questions of law or fact never presents any obstacle to the exercise of judicial power.

Thus, the writ of *habeas corpus* is the absolute constitu-

tional right of the citizen. Upon that writ, from the earliest period at which civil liberty had a place or name, down to *Ex parte Milligan*, in the last published volume of Wallace,\* the humblest individual has had power to arraign before the judicial magistrate any act of the political departments affecting his imprisonment, and to procure a judicial deliverance from the grasp of any executive officer, however exalted. The judicial power—whether State or Federal—can examine and condemn, as unconstitutional and utterly void, every legislative act and every executive decree which, by its terms, purport, or intent, would debar the prisoner from a discharge to which, in the judgment of the judiciary, he is entitled by the Constitution. So in prize cases, in questions of title to land involving a determination as to the boundaries of States and Territories, foreign or domestic,—questions as completely within the idea of a " subject-matter political in its *nature*" as can be conceived,—are of every-day occurrence in the judicial tribunals.

It is, in short, no impediment in any case that this judicial power may condemn acts of men exercising political power which work a prejudice to the rights of any juridical or natural person suing for justice. If the rights imperilled be of a civil nature, entitled to protection under the principles of the Constitution and capable of being protected by the ordinary operation of known and established judicial remedies, the jurisdiction is perfect.

Such cases do not present *political* questions, in any proper sense. For when the term is employed for any definite purpose in jurisprudence, it means a question which the Constitution, or some valid law, intrusts exclusively to the one or both of the departments, commonly styled political.

II. That a question affecting *political rights* can be the subject of judicial cognizance was decided affirmatively, in the face of the objection now urged, both at the bar and in the hall of conference, in *Rhode Island* v. *Massachusetts*.† The suit brought by Rhode Island was to vindicate the right of juris-

---

\* 4 Wallace, 4.                              † 12 Peters, 669.

diction and sovereignty in and over a disputed territory; the kind of question that in other countries begins in diplomacy and ends in a treaty or in war.   The great State of Massachusetts vigorously—almost indignantly—repelled the jurisdiction as an assumption of *political* power.   She intimated power in her self to resist, and inability by the court to enforce, its judgment.

Mr. Austin, her counsel,* said :

" This court has no jurisdiction, because of the nature of the suit.   It is in its character political; in the highest degree political; brought by a sovereign, in that avowed character, for the restitution of sovereignty.   The judicial power of the United States extends, by the Constitution, only to cases of law and equity.   The terms have relation to English jurisprudence. Suits of the present kind are not of the class belonging to law or equity, as administered in England."

This pointed presentation of the question was sustained by the powerful dissent of Taney, C. J.   He says :

" In the case before the court, we are called on to protect and enforce the ' mere political jurisdiction' of Rhode Island; and the bill of the complainant, in effect, asks us to ' control the legislature of Massachusetts, and to restrain the exercise of its physical force' within the disputed territory."

The dissent, however, is only a dissent.   It has no authoritative force.   It only serves, like all dissenting opinions, to prove the distinctness with which the question was presented, and to set out in relief, and to give emphasis and power to the decision of the court.   The *court* maintained the jurisdiction.†

Mr. Hazard, for Rhode Island, met and answered the objection.   The case did not involve the title to land or to money; nor does the Constitution say a word about boundary in giving jurisdiction over cases between States.   It was a case of disputed sovereignty and jurisdiction over five

---

<small>* page 671.</small>          † And see Fowler *v.* Lindsey, 3 Dallas, 413.

thousand people; and the court entertained jurisdiction because of the parties, and pronounced definitive judgment.

The early case of *New York* v. *Connecticut*,* and *Pennsylvania* v. *The Wheeling Bridge*,† are in accordance with our views.

The Attorney-General places much reliance upon *The Cherokee Nation* v. *The State of Georgia.* The court there held that the Cherokee Nation was not a foreign state in the sense of the Constitution—was not a state that could sue in the courts of the United States, and, therefore, that the court had no jurisdiction, for the want of a proper party to the bill. All beyond that was *obiter dictum.* But what was that case? It was a bill, not against the agents of the State of Georgia, but a bill to restrain the State, as a State in its corporate capacity, from the execution of its laws, and at a time when the State was actually executing them by force. If the present bill was filed against the government of the United States to restrain it, as a government, from executing by force the laws in question, there might be some analogy; but it is not a bill against the government; it is a bill to restrain subordinate officers. The decision in *Marbury* v. *Madison* shows that such a bill is sustainable.

Independently of all this, rights of property are here involved. The bill alleges that more than $5,000,000 of real and personal estate are about to be taken away.

*Reply :* The cases of *New York* v. *Connecticut,* and *Rhode Island* v. *Massachusetts,* show that the Supreme Court entertains jurisdiction of cases involving questions of boundary because a right to land is in dispute. The fact that political consequences were involved was a mere incident. In the latter case the primary object of the bill was, that the northern boundary between Rhode Island and Massachusetts might be ascertained and established, and that the rights of jurisdiction and sovereignty would be ascertained and settled also was a consequence of this. In the Wheeling Bridge case, the

---

* 3 Dallas, 4.                          † 13 Howard, 579.

State of Pennsylvania was granted relief, not because of her political character, but because she was the owner of canals and railroads terminating at Pittsburg, costing her treasury many millions, which it was held would be irreparably injured by the bridge. This bill shows no such case. Property is here a mere accessory or incident, and no injury is threatened to it that equity will enjoin. From beginning to end, there is no ground set out in the bill upon which anything like judicial cognizance can be founded by any power of this court.

The bill having been dismissed at the last term, Mr. Justice NELSON now delivered the opinion of the court.

A motion has been made by the counsel for the defendants to dismiss the bill for want of jurisdiction, for which a precedent is found in the case of *The State of Rhode Island* v. *The State of Massachusetts.** It is claimed that the court has no jurisdiction either over the subject-matter set forth in the bill or over the parties defendants. And, in support of the first ground, it is urged that the matters involved, and presented for adjudication, are political and not judicial, and, therefore, not the subject of judicial cognizance.

This distinction results from the organization of the government into the three great departments, executive, legislative, and judicial, and from the assignment and limitation of the powers of each by the Constitution.

The judicial power is vested in one supreme court, and in such inferior courts as Congress may ordain and establish: the political power of the government in the other two departments.

The distinction between judicial and political power is so generally acknowledged in the jurisprudence both of England and of this country, that we need do no more than refer to some of the authorities on the subject. They are all in one direction.†

* 12 Peters, 669.

† Nabob of Carnatic v. The East India Co., 1 Vesey, Jr., 375–393, S. C., 2 Id. 56–60; Penn v. Lord Baltimore, 1 Vesey, 446–7 ; New York v. Connecticut,

It has been supposed that the case of *The State of Rhode Island* v. *The State of Massachusetts** is an exception, and affords an authority for hearing and adjudicating upon political questions in the usual course of judicial proceedings on a bill in equity. But, it will be seen on a close examination of the case, that this is a mistake. It involved a question of boundary between the two States. Mr. Justice Baldwin, who delivered the opinion of the court, states the objection, and proceeds to answer it. He observes,† "It is said that this is a political, not civil controversy, between the parties; and, so not within the Constitution, or thirteenth section of the Judiciary Act. As it is viewed by the court, on the bill alone, had it been demurred to, a controversy as to the locality of a point three miles south of the southernmost point of Charles River, is the only question that can arise under the charter. Taking the case on the bill and plea, the question is, whether the stake set up on Wrentham Plain by Woodward and Saffrey, in 1842, is the true point from which to run an east and west line as the compact boundary between the States. In the first aspect of the case it depends on a fact; in the second, on the law of equity, whether the agreement is void or valid; neither of which present a political controversy, but one of an ordinary judicial nature of frequent occurrence in suits between individuals." In another part of the opinion, speaking of the submission by sovereigns or states, of a controversy between them, he observes, "From the time of such submission the question ceases to be a political one, to be decided by the *sic volo, sic jubeo,* of political power. It comes to the court to be decided by its judgment, legal discretion, and solemn consideration of the rules of law, appropriate to its nature as a judicial question, depending on the exercise of judicial powers, as it is bound to act by known and settled principles of national or municipal jurisprudence, as the case requires."

4 Dallas, 4–6; The Cherokee Nation *v.* Georgia, 5 Peters, 1, 20, 29, 30, 51, 75; The State of Rhode Island *v.* The State of Massachusetts, 12 Ib. 657, 733, 734, 737, 738.

* 12 Peters, 657.                              † Page 736.

And he might have added, what, indeed, is probably implied in the opinion, that the question thus submitted by the sovereign, or state, to a judicial determination, must be one appropriate for the exercise of judicial power; such as a question of boundary, or as in the case of *Penn* v. *Lord Baltimore*, a contract between the parties in respect to their boundary.   Lord Hardwicke places his right in that case to entertain jurisdiction upon this ground.

The objections to the jurisdiction of the court in the case of Rhode Island against Massachusetts were, that the subject-matter of the bill involved sovereignty and jurisdiction, which were not matters of property, but of political rights over the territory in question.   They are forcibly stated by the Chief Justice, who dissented from the opinion.*   The very elaborate examination of the case by Mr. Justice Baldwin, was devoted to an answer and refutation of these objections.   He endeavored to show, and, we think did show, that the question was one of boundary, which, of itself, was not a political question, but one of property, appropriate for judicial cognizance; and, that sovereignty and jurisdiction were but incidental, and dependent upon the main issue in the case.   The right of property was undoubtedly involved; as in this country, where feudal tenures are abolished, in cases of escheat, the State takes the place of the feudal lord, by virtue of its sovereignty, as the original and ultimate proprietor of all the lands within its jurisdiction.

In the case of *The State of Florida* v. *Georgia*,† the United States were allowed to intervene, being the proprietors of a large part of the land situated within the disputed boundary, ceded by Spain as a part of Florida.   The State of Florida was also deeply interested as a proprietor.

The case, bearing most directly on the one before us, is *The Cherokee Nation* v. *The State of Georgia*.‡   A bill was filed in that case and an injunction prayed for, to prevent the execution of certain acts of the legislature of Georgia within the territory of the Cherokee Nation of Indians, they claim-

---

* 12 Peters, 752, 754.   † 17 Howard, 478.   ‡ 5 Peters, 1.

ing a right to file it in this court, in the exercise of its original jurisdiction, as a foreign nation. The acts of the legislature, if permitted to be carried into execution, would have subverted the tribal government of the Indians; and subjected them to the jurisdiction of the State. The injunction was denied, on the ground that the Cherokee Nation could not be regarded as a foreign nation within the Judiciary Act; and, that, therefore, they had no standing in court. But, Chief Justice Marshall, who delivered the opinion of the majority, very strongly intimated, that the bill was untenable on another ground, namely, that it involved simply a political question. He observed, "That the part of the bill which respects the land occupied by the Indians, and prays the aid of the court to protect their possessions, may be more doubtful. The mere question of right might, perhaps, be decided by this court in a proper case with proper parties. But the court is asked to do more than decide on the title. The bill requires us to control the legislature of Georgia, and to restrain the exertion of its physical force. The propriety of such an interposition by the court may be well questioned. It savors too much of the exercise of political power, to be within the province of the judicial department." Several opinions were delivered in the case; a very elaborate one, by Mr. Justice Thompson, in which Judge Story concurred. They maintained that the Cherokee Nation was a foreign nation within the Judiciary Act, and, competent to bring the suit; but, agreed with the Chief Justice, that all the matters set up in the bill involved political questions, with the exception of the right and title of the Indians to the possession of the land which they occupied. Mr. Justice Thompson, referring to this branch of the case, observed: "For the purpose of guarding against any erroneous conclusions, it is proper I should state, that I do not claim for this court, the exercise of jurisdiction upon any matter properly falling under the denomination of political power. Relief to the full extent prayed for by the bill may be beyond the reach of this court. Much of the matters therein contained by way of complaint, would seem to depend for relief upon

the exercise of political power; and, as such, appropriately devolving upon the executive, and not the judicial department of the government. This court can grant relief so far, only, as the rights of persons or property are drawn in question, and have been infringed." And, in another part of the opinion, he returns, again, to this question, and, is still more emphatic in disclaiming jurisdiction. He observes: "I certainly do not claim, as belonging to the judiciary, the exercise of political power. That belongs to another branch of the government. The protection and enforcement of many rights secured by treaties, most certainly do not belong to the judiciary. It is only where the rights of persons or property are involved, and when such rights can be presented under some judicial form of proceedings, that courts of justice can interpose relief. This court can have no right to pronounce an abstract opinion upon the constitutionality of a State law. Such law must be brought into actual, or threatened operation upon rights properly falling under judicial cognizance, or a remedy is not to be had here." We have said Mr. Justice Story concurred in this opinion; and Mr. Justice Johnson, who also delivered one, recognized the same distinctions.*

By the second section of the third article of the Constitution "the judicial power extends to all cases, in law and equity, arising under the Constitution, the laws of the United States," &c., and as applicable to the case in hand, "to controversies between a State and citizens of another State,"—which controversies, under the Judiciary Act, may be brought, in the first instance, before this court in the exercise of its original jurisdiction, and we agree, that the bill filed, presents a case, which, if it be the subject of judicial cognizance, would, in form, come under a familiar head of equity jurisdiction, that is, jurisdiction to grant an injunction to restrain a party from a wrong or injury to the rights of another, where the danger, actual or threatened, is irreparable, or the remedy at law inadequate. But, according to the course of

---

* 5 Peters, 29–30.

proceeding under this head in equity, in order to entitle the party to the remedy, a case must be presented appropriate for the exercise of judicial power; the rights in danger, as we have seen, must be rights of persons or property, not merely political rights, which do not belong to the jurisdiction of a court, either in law or equity.

The remaining question on this branch of our inquiry is, whether, in view of the principles above stated, and which we have endeavored to explain, a case is made out in the bill of which this court can take judicial cognizance. In looking into it, it will be seen that we are called upon to restrain the defendants, who represent the executive authority of the government, from carrying into execution certain acts of Congress, inasmuch as such execution would annul, and totally abolish the existing State government of Georgia, and establish another and different one in its place; in other words, would overthrow and destroy the corporate existence of the State, by depriving it of all the means and instrumentalities whereby its existence might, and, otherwise would, be maintained.

This is the substance of the complaint, and of the relief prayed for. The bill, it is true, sets out in detail the different and substantial changes in the structure and organization of the existing government, as contemplated in these acts of Congress; which, it is charged, if carried into effect by the defendants, will work this destruction. But, they are grievances, because they necessarily and inevitably tend to the overthrow of the State as an organized political body. They are stated, in detail, as laying a foundation for the interposition of the court to prevent the specific execution of them; and the resulting threatened mischief. So in respect to the prayers of the bill. The first is, that the defendants may be enjoined against doing or permitting any act or thing, within or concerning the State, which is or may be directed, or required of them, by or under the two acts of Congress complained of; and the remaining four prayers are of the same character, except more specific as to the particular acts threatened to be committed.

That these matters, both as stated in the body of the bill, and, in the prayers for relief, call for the judgment of the court upon political questions, and, upon rights, not of persons or property, but of a political character, will hardly be denied.   For the rights for the protection of which our authority is invoked, are the rights of sovereignty, of political jurisdiction, of government, of corporate existence as a State, with all its constitutional powers and privileges.   No case of private rights or private property infringed, or in danger of actual or threatened infringement, is presented by the bill, in a judicial form, for the judgment of the court.

It is true, the bill, in setting forth the political rights of the State, and of its people to be protected, among other matters, avers, that Georgia owns certain real estate and buildings therein, State capitol, and executive mansion, and other real and personal property; and that putting the acts of Congress into execution, and destroying the State, would deprive it of the possession and enjoyment of its property. But, it is apparent, that this reference to property and statement concerning it, are only by way of showing one of the grievances resulting from the threatened destruction of the State, and in aggravation of it, not as a specific ground of relief.   This matter of property is neither stated as an independent ground, nor is it noticed at all in the prayers for relief.   Indeed the case, as made in the bill, would have stopped far short of the relief sought by the State, and its main purpose and design given up, by restraining its remedial effect, simply to the protection of the title and possession of its property.   Such relief would have called for a very different bill from the one before us.

Having arrived at the conclusion that this court, for the reasons above stated, possesses no jurisdiction over the subject-matter presented in the bill for relief, it is unimportant to examine the question as it respects jurisdiction over the parties defendants.

The CHIEF JUSTICE: Without being able to yield my assent to the grounds stated in the opinion just read for the

dismissal of the complainant's bill, I concur fully in the conclusion that the case made by the bill, is one of which this court has no jurisdiction.

BILL DISMISSED FOR WANT OF JURISDICTION.